**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

WILLIAM B. MOODY and
LESLIE S. MOODY,

                Plaintiffs,

v.

MICROPORT ORTHOPEDICS, INC.,
a Delaware Corporation, and
ONKOS SURGICAL, INC.,
a Delaware Corporation,

                Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs William B. Moody and Leslie S. Moody, by and through their attorney George E. McLaughlin, McLaughlin Law Firm, P.C., for their Complaint against Defendants, state and allege as follows.

### THE PARTIES

1. Plaintiff William B. Moody resides in Centennial, Douglas County, Colorado, and is a citizen of the State of Colorado.

2. Plaintiff Leslie S. Moody resides in Centennial, Douglas County, Colorado, and is a citizen of the State of Colorado.

3. At all times relevant hereto, Plaintiffs William B. Moody and Leslie S. Moody were and are legally married to each other and reside together as husband and wife in Douglas County, Colorado.

4.      Defendant MicroPort Orthopedics, Inc., at all times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the products that are in issue in this civil action.

5.      Defendant Onkos Surgical, Inc., is a Delaware corporation with its principal place of business at 77 East Halsey Road, Parsippany, New Jersey 07054, and as such is deemed to be a citizen of the State of Delaware and the State of New Jersey.

6.      Defendant Onkos Surgical, Inc., at all times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the products that are in issue in this civil action.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c), as a substantial part of the events giving rise to this claim occurred in the State of Colorado.

## FACTUAL ALLEGATIONS

## PLAINTIFF WILLIAM B. MOODY'S ORTHOPEDIC DEVICES

9.      In 2015 Plaintiff William B. Moody had various artificial knee devices implanted in the left side of his body in a procedure known as a knee revision surgery.

10.     The artificial knee devices implanted in Plaintiff William B. Moody in January of 2015 were a combination of devices, which collectively are known as the Eleos Limb Salvage System.

11.     One of the components of the Eleos Limb Salvage System is a device known as the Tibial Hinge Component.

12.     In January 2014 Wright Medical sold its hip and knee division to MicroPort Orthopedics, Inc., including its existing inventory of already manufactured hip and knee devices.

13.     While some hip and knee devices manufactured prior to the sale of the Wright Medical hip and knee devices bear the identifying marking of Wright Medical Technology, or labeling of Wright Medical Technology, any such devices distributed, sold, or implanted after the sale to MicroPort were the property of, and for most market surveillance the responsibility of MicroPort.

14.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which originally were designed by Wright Medical Technology, Inc., under the brand name Guardian Limb Salvage System.

15.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which originally were manufactured by Wright Medical Technology, Inc., under the brand name Guardian Limb Salvage System.

16.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which were designed by MicroPort.

17.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which were manufactured by MicroPort.

18.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which were designed by Onkos.

19.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, some of which were manufactured by Onkos.

20.     The artificial knee devices implanted in Plaintiff William B. Moody in January 2015 were a combination of devices, which were distributed and/or sold by Onkos.

21.     Based upon the marketing of the Limb Salvage System by Defendants at the time of the implantation of the Limb Salvage System in Plaintiff William B. Moody, he was an appropriate patient to receive these devices.

22.     For a period of time these devices performed as intended and expected in Plaintiff William B. Moody.

23.     On June 10, 2019, the Tibial Hinged Component of the Limb Salvage System catastrophically failed, fracturing at the portion of the device generally known as the "keel".

24.     The fracture of the Tibial Hinged Component required Plaintiff to undergo an emergency revision surgery on June 25, 2019 to remove and replace the failed components, and other related devises, of his Limb Salvage System.

25.     In the judgment of Plaintiff's surgeon, the best option at that time was to replace the failed Tibial Hinge Component, and other related devices, with similar devices.

26.     Less than one year later, in April of 2020, the same device, the Tibial Hinged Component of the Limb Salvage System again catastrophically failed, fracturing at the portion of the device generally known as the "keel".

27.     The fracture of the Tibial Hinged Component required Plaintiff to undergo an emergency revision surgery on April 3, 2020, to remove and replace the failed components, and other related devices, of his Limb Salvage System.

28.     In the judgment of Plaintiff's surgeon, the best option at that time again was to replace the failed Tibial Hinge Component, and other related devices, with similar devices.

29.     After the April 3, 2020, Plaintiff developed an infection at the surgical site, requiring the removal of all of the implanted devices, and placement of an antibiotic spacer.

30.     On April 28, 2020, Plaintiff underwent another revision surgery to remove the antibiotic spacer, and revise his hip, again with similar components.

31.     Approximately six months later, the same device, the Tibial Hinged Component of the Limb Salvage System catastrophically failed for the third time, fracturing at the portion of the device generally known as the "keel".

32.     This time all of the Limb Salvage System devices were removed and replaced by devices manufactured by medical device companies other than Wright Medical, MicroPort, or Onkos.

33.     Based upon the patient population that Defendants intended their Limb Salvage Systems to be implanted in, and when Plaintiff William B. Moody had the devices implanted in him in 2015, he was an appropriate patient to be implanted with these artificial knee products.

34.     Subsequent to the date of implantation of his Limb Salvage System, Plaintiff William B. Moody used his Limb Salvage System artificial knee in a normal and expected manner.

35.     At the time of the catastrophic failure, Plaintiff William B. Moody was performing a normal and expected activity of his daily living.

36.     The structural failure of the Hinged Tibial Component of Plaintiff's artificial knee was the result of a fatigue failure of the cobalt chrome metal alloy, caused over time by cyclic loading of the device, resulting in a complete fracture of the keel of the device.

37.     With the exception of the fact that the keel of the Hinged Tibial Component had fractured, the components of Plaintiff's Limb Salvage System were in substantially the same condition in all relevant respects as when they left Defendants' control.

38.     With the exception of the fact that the keel of the Hinged Tibial Component had fractured, the components of Plaintiff's Limb Salvage System were not otherwise in need of revision.

39.     With the exception of the fact that the keel of the Hinged Tibial Component had fractured, the components of Plaintiff's Limb Salvage System devices were reasonably expected to have lasted for the remainder of his life without the metal keel fracturing.

## ALLEGATIONS OF DEFECTIVE PRODUCTS

40.     The Hinged Tibial Component is designed in a way that after implantation in a patient it is subject to high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the keel of the Hinged Tibial Component.

41.     The Hinged Tibial Component is manufactured in a way that after implantation in a patient it is subject to high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the keel of the Hinged Tibial Component.

42.     The Hinged Tibial Component is designed in a way that after implantation in a patient it is subject to high loading and stress, thereby increasing the potential for structural failure

due to fatigue failure and fracture of the keel of the Hinged Tibial Component as a result of being subjected to the normal and expected activities of daily living.

43.     The Limb Salvage System in general, and the Hinged Tibial Component implanted in Plaintiff William B. Moody, was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

A.   It was and is unreasonably dangerous under Colorado, product liability law as a result of one or more of a combination of the following:

(1) the Limb Salvage System was designed in such a way that there is a point of highest stress on the keel of the Hinged Tibial Component;

(2) the Limb Salvage System was designed in such a way that the metal alloy of the device is subject to fracture during normal and expected use;

(3) the Limb Salvage System was manufactured in such a way that the metal alloy of the device is subject to fracture during normal and expected use;

(4) the risk of fracture outweighed the utility of the device, considering other technically feasible alternatives, and other already existing alternative products;

(5) a reasonably prudent manufacturer or seller, given knowledge of the product's condition, would not have marketed, or sold the product; and,

(6) there may be other conditions or defects yet to be determined.

B.   It was dangerous to an extent beyond which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(1) the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the catastrophic structural failure of the keel of the Hinged Tibial Component; and,

(2) the ordinary consumer would not contemplate that the keel of the Hinged Tibial Component would catastrophically structurally fail as a result of being used in the manner and for activity levels that it was intended.

44.     The Hinged Tibial Component is not designed to withstand the normal activities of daily living after implantation without catastrophic structural failure of the keel of the Hinged Tibial Component from a fatigue fracture during the expected useful life of that component.

45.     The Hinged Tibial Component is not designed to withstand the normal activities of daily living after implantation in the intended patient population for use of this device.

46.     The Hinged Tibial Component was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was intended for, without catastrophic structural failure of the keel of the Hinged Tibial Component from a fatigue fracture during the expected useful life of that component.

47.     The Hinged Tibial Component was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was marketed for, without catastrophic structural failure of the keel of the Hinged Tibial Component from a fatigue fracture during the expected useful life of that component.

48.     The Hinged Tibial Component was not designed to withstand the forces, without catastrophic structural failure of the keel of the Hinged Tibial Component from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Plaintiff William B. Moody in this case.

49.     After Defendants received notice that the Hinged Tibial Component was failing from structural failure of the keel by fractures, they did not provide post-sale warnings to patients who had these devices implanted, or their surgeons, that included the following information:

    A. The keel of the Hinged Tibial Component may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

B. If the keel of the Hinged Tibial Component of their knee did suddenly and catastrophically fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death; and,

C. These devices were structurally failing by fractures of the keel of the Hinged Tibial Component at higher than expected rates in patients of many different weights and levels of activity.

50. After Defendants received notice that the Limb Salvage System with the Hinged Tibial Component was failing from structural failure of the keel by fractures it did not inform surgeons who implanted these devices of that fact, and the growing number of reported fractures.

## ACCRUAL OF THIS CAUSE OF ACTION

51. Prior to June 10, 2019, Plaintiff William B. Moody had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Limb Salvage System or its Hinged Tibial Component.

52. Prior to June 10, 2019, Plaintiff William B. Moody had neither knowledge nor notice that he had suffered any injury because of any actions or inactions, errors or omissions, by any of the defendants.

53. It was not until June 10, 2019, Plaintiff William B. Moody first had any notice or knowledge that his injuries and/or that the failure of the Limb Salvage System or its Hinged Tibial Component implanted in his left knee was the result of any defects in the design, manufacture, warning or labeling of his implanted Limb Salvage System.

54. Prior to June 10, 2019, Plaintiff William B. Moody did not know, and could not have known by the exercise of reasonable diligence, that his knee had been injured by the failure of the Limb Salvage System or its Hinged Tibial Component.

55.     Prior to June 10, 2019, Plaintiff William B. Moody had no reason to know or suspect that the implanted Limb Salvage System or its Hinged Tibial Component was defective or was in the process of structurally failing due to a fatigue fracture.

56.     Plaintiff William B. Moody's cause of action, as alleged in this Complaint against Defendants, did not accrue until June 10, 2019.

## PLAINTIFFS' INJURIES AND DAMAGES

57.     As a direct and proximate result of the failure of Plaintiff's Limb Salvage System, Plaintiff William B. Moody has sustained injuries and damages including, but not limited to:

A.  undergoing multiple surgeries to remove and replace the failed Limb Salvage System and its Hinged Tibial Component;

B.  past and future pain and anguish, both in mind and in body;

C.  permanent diminishment of his ability to participate in and enjoy the affairs of life;

D.  medical bills in excess of $75,000 associated with the replacement procedure and recovery therefrom;

E.  future medical expenses;

F.  loss of enjoyment of life;

G.  disfigurement; and,

H.  physical impairment.

58.     As a direct and proximate result of the failure of Plaintiff's Limb Salvage System or its Hinged Tibial Component, Plaintiff Leslie S. Moody has sustained injuries and damages including, but not limited to the loss of consortium of her husband, William B. Moody.

## CAUSES OF ACTION

### COUNT I

### STRICT LIABILITY OF DEFENDANTS

59.     Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

60.     Defendants MicroPort Orthopedics, Inc., and Onkos Surgical, Inc., had a duty to place into the stream of commerce, manufacture, import, distribute, market, promote and sell the Limb Salvage System in general, and specifically the Tibial Hinge Component, so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed, and sold.

61.     Until approximately January 9, 2014, Wright Medical was engaged in the business of designing, manufacturing, marketing, distributing, and selling orthopedic knee implants, and did design, manufacture, import distribute, market, and sell the Guardian Limb Salvage System, and related Tibial Hinge Component.

62.     On or about January 9, 2014, Wright Medical sold its hip and knee division to MicroPort.

63.     After January 9, 2014, Defendant MicroPort became engaged in the business of designing, manufacturing, importing, marketing, distributing, and selling orthopedic knee implants and did design, manufacture, import, distribute, market, and sell the Guardian Limb Salvage System, and related Tibial Hinge Component, as well as itself manufacturing, distributing, and selling the Guardian Limb Salvage System, and the Tibial Hinge Component.

64.     At some point in time Defendant Onkos entered into a business agreement with MicroPort to acquire the Limb Salvage System from it, or have MicroPort license to it the product for continued design, development, manufacturing, marketing, and/or distribution.

65.     Sometime after January 1, 2015, Defendant Onkos became engaged in the business of designing, manufacturing, marketing, distributing, and selling orthopedic knee implants, and did design, manufacture, distribute, market, and sell the Eleos Limb Salvage System, and related Tibial Hinge Component, as well as itself manufacturing, distributing, and selling the Eleos Limb Salvage System, and related Tibial Hinge Component.

66.     The Eleos Limb Salvage System, and related Tibial Hinge Component, is the same product as the Guardian Limb Salvage System, and related Tibial Hinge Component.

67.     Defendants expected the Limb Salvage System, and the Tibial Hinge Component, they designed, and were manufacturing, marketing, distributing, supplying, and/or selling to reach, and which did in fact reach, hospitals, implanting physicians, and consumers in the State of Colorado, including Plaintiff William B. Moody, and/or Plaintiff's surgeons, without substantial change in its condition.

68.     At the time the Limb Salvage System, and the Tibial Hinge Component, left the possession of Defendants and at the time the devices entered the stream of commerce, they were in an unreasonably dangerous or defective condition.  These defects include, but are not limited to, the following:

      A.  the device was not reasonably safe as intended to be used;

      B.  the device had an inadequate design for the purpose of knee replacement in the population it was intended to be used in and was marketed to;

C. the device contained unreasonably dangerous design defects, including an inherently unstable and defective design, i.e., the use of the particular cobalt chrome alloys and manufacturing processes, which resulted in an unreasonably high probability of structural failure;

D. the device contained unreasonably dangerous manufacturing defects, including an inherently unstable and defective manufacturing processes which resulted in an unreasonably high probability of structural failure;

E. the device's defective design resulted in a knee prosthesis that had risks which exceeded the utility of the medical device in the intended patient population;

F. the device was dangerous to an extent beyond which would be contemplated by the ordinary consumer;

G. a reasonably prudent manufacturer, distributor, or seller, given knowledge of the device's condition, would not have marketed, distributed, or sold the device;

H. the device was not appropriately or adequately tested before its distribution or sale; and,

I. the device has an unreasonably high propensity for fatigue failure under normal, intended, and expected use.

69. At the time of Defendants' design, manufacture, marketing, distribution, and sale of the Limb Salvage System, and the Tibial Hinge Component, feasible, alternative safer designs for the device were known and available, including, but not limited to, designs that utilized manufacturing and finishing processes that would make the keel of the Hinged Tibial Component stronger in this application, and less likely to suffer a structural failure from fatigue than the design and processes that were in fact used by Defendants.

70. At the time of Defendants' design, manufacture, marketing, distribution, and sale of the Limb Salvage System, and the Tibial Hinge Component, feasible, alternative safer designs for the device were known and available, including, but not limited to, designs that utilized a

cobalt-chromium alloy manufacturing processes that would make the keel stronger in this application, and less likely to suffer a structural failure from fatigue.

71.     Had Defendants properly and adequately tested the device, it would have discovered that over time the keel of the Hinged Tibial Component it designed would not withstand the stress it was expected to be subjected to in the ordinary and expected use of the device in a significant number of patients that it was intended to be used in, and marketed to be used in, and was certain to structurally fail in numbers and at rates significantly higher than expected, and was certain to structurally fail in numbers and at rates significantly higher than other available alternative devices.

72.     Defendants' Limb Savage System and the Hinged Tibial Components were, therefore, defective in design in that, when they left the hands of Defendants the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the device's design, and/or it was dangerous to an extent beyond which would be contemplated by the ordinary user or consumer.

73.     The foreseeable risks associated with the design of the Limb Savage System and the Hinged Tibial Component devices include, but are not limited to, the fact that the design of the devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

74.     As a direct and proximate result of the conduct of Defendants as set forth herein, Plaintiff William B. Moody has suffered injuries and damages.

**COUNT II**

**<u>NEGLIGENT FAILURE TO WARN</u>**

75.     Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

76.     At all times relevant herein, Defendants were engaged in the design, development, testing, manufacturing, importing, marketing, and sale of the Limb Salvage System devices in general, and the Hinged Tibial Component specifically.

77.     Defendants designed, manufactured, marketed, distributed, and sold the Limb Salvage System devices in general, and the Hinged Tibial Component specifically, to hospitals, to surgeons, and to potential patients knowing that they would then be implanted in patients in need of knee prosthesis with a wide variety of ages, height, body weight, activity levels, and lifestyles.

78.     Defendants distributed and sold the Limb Salvage System devices in general, and the Hinged Tibial Component specifically, in a condition when they left their place of manufacture, in their original form of manufacture, which included the defects described herein.

79.     The Limb Salvage System devices in general, and the Hinged Tibial Component specifically, were expected to and did reach Plaintiff William B. Moody and his implanting surgeon, without substantial change in their condition as manufactured and sold by Defendants.

80.     Defendants' Limb Salvage System devices in general, and the Hinged Tibial Component specifically, were designed, developed, tested, manufactured, marketed, and sold or otherwise placed into the stream of commerce by Defendants in a dangerous and defective condition and posed a threat to most any and all users or consumers of these devices.

81.     At all times relevant herein, Plaintiff William B. Moody was a person who Defendants should have considered to be subject to the harm caused by the defective nature of the Limb Salvage System devices in general, and the Hinged Tibial Component specifically.

82.     Defendants' Limb Salvage System devices, including the Hinged Tibial Component, were implanted and used in the manner for which they were intended.

83.     Defendants knew or should have known through testing, adverse event reporting or otherwise, that its Limb Salvage System devices in general, and the Hinged Tibial Component specifically, created a substantially higher risk of bodily injury and serious harm, from structural failure of the keel of the Hinged Tibial Component by fatigue failure, than other available knee stem devices.

84.     Defendants had a duty to warn its sales representatives/distributors, purchasing hospitals, implanting surgeons, and patients, including Plaintiff William B. Moody, of this substantially higher risk of bodily injury and serious harm, from structural failure of the keel of the Hinged Tibial Component by fatigue failure.

85.     Defendants breached their duty in that they failed to provide adequate and timely warnings or instructions regarding its Limb Salvage System devices in general, and the Hinged Tibial Component specifically, and their known defects.

86.     Defendants furthermore breached their duty to warn at pre-surgery and/or post-surgery [i.e., post-sale] by (a) failing to adequately communicate the warning to its sales representatives/distributors, purchasing hospitals, surgeons, and/or to the ultimate users, patients such as Plaintiff William B. Moody; and/or (b) by failing to provide adequate warning of the risk of sudden catastrophic structural failure of the Hinged Tibial Component.

87.     Adequate efforts to communicate a warning to the ultimate users were not made by Defendants and, to the extent a warning was communicated by Defendants, the warning was inadequate, all of which was negligent conduct on the part of Defendants.

88.     The warnings, pre-surgery and/or post-surgery [i.e., post-sale], to Plaintiff William B. Moody and his implanting surgeon about the dangers the Limb Salvage System devices in general, and the Hinged Tibial Component specifically, posed to consumers were inadequate.

89.     Plaintiff William B. Moody used the Limb Salvage System in general, and the Tibial Hinge Component for its intended purpose.

90.     Plaintiff William B. Moody and his implanting surgeon did not have substantially the same knowledge about the device as Defendants who were the designers, manufacturers, importers, and/or distributors of the device.

91.     Defendants should have known if their device was unsuited for individuals such as Plaintiff William B. Moody, and expressly so stated in its instructional, marketing, and informational materials it published in paper, on the internet, in its IFU's and in the information it provided to its sales force, distributors, and surgeons.

92.     The conduct of Defendants, as set forth above, rendered the Tibial Hinge Component unreasonably dangerous.

93.     As a direct and proximate result of Defendants' failure to adequately warn, failure to warn, and other wrongful conduct as set forth herein, Plaintiff William B. Moody has suffered injuries and damages.

## COUNT IV

## GENERAL NEGLIGENCE OF DEFENDANTS

94.     Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

95.     Defendants had a duty to exercise reasonable care in the design, manufacture, testing, quality assurance, quality control, labeling, warning, marketing, promotion, sale and distribution, and in providing post-sale warnings, of the Limb Salvage System in general, and the Hinged Tibial Component in particular.

96.     Defendants failed to exercise ordinary care, and were negligent in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, warning, marketing, promotion, and distribution of the Limb Salvage System in general, and the keel of the Hinged Tibial Component in particular, in that Defendants knew or should have known the facts alleged and set forth above in this Complaint.

97.     Defendants additionally failed to exercise ordinary care and were negligent in testing and failing to adequately test the Limb Salvage System and the Hinged Tibial Components prior to their marketing, sale and distribution.

98.     Had Defendants adequately tested the keel of the Hinged Tibial Component stem junction in its Limb Salvage System, they would have discovered that the keel was certain not to withstand over time without fracture the forces that it would be subjected to in the ordinary activities of some patients that these devices were reasonably expected to be implanted in.

99.     Defendants were negligent in failing to warn Plaintiff William B. Moody and his surgeon, that after the knee replacement [i.e., post-sale] that there was an increased risk the keel of the Tibial Hinged Component would fracture from metal fatigue during normal and expected use, compared to the risk of fracture of other artificial knee stems.

100.    Defendants were negligent in the choice of the manufacturing processes used to make the cobalt chrome alloy for Tibial Hinged Component as the processes used made the device

more likely to fail by fracture, than if other well-known and generally accepted manufacturing processes were used.

101.   Defendants were negligent in not employing manufacturing techniques, and surface treatments to the Tibial Hinged Component that would have increased its resistance to fracture from metal fatigue caused by cyclic loading.

102.   Defendants knew or had reason to know that Plaintiff William B. Moody, as a member of the general public for whose use the device was placed into interstate commerce, would be likely to use the device in a manner described in this Complaint.

103.   Defendants knew or reasonably should have known of the danger associated with the manner and circumstances of Plaintiff William B. Moody's foreseeable use of the device, which dangers would not be obvious to the general public.

104.   Despite the fact that Defendants knew or should have known that the Limb Salvage System in general, and the Hinged Tibial Component specifically, posed a serious risk of bodily harm to consumers, Defendants negligently continued to manufacture and market these devices for use by consumers, and provided them to hospitals and to surgeons for implantation.

105.   Defendants knew or should have known that consumers such as Plaintiff William B. Moody would foreseeably suffer injury as a result of its negligence and failure to exercise ordinary care as described above.

106.   Defendants' conduct, as described above and throughout this Complaint, including, but not limited to, Defendants' inadequate design, failure to adequately test, failure to warn, misrepresentations, and false statements, as well as its continued marketing and distribution of the Limb Salvage System devices in general, and the Hinged Tibial Component specifically, when it

knew or should have known of the serious health risks these devices created and/or the failure to comply with federal reporting and labeling requirements, was negligent.

107.    As a direct and proximate result of Defendants' negligence, failure to exercise ordinary care, and other tortious and wrongful conduct as set forth herein, Plaintiff William B. Moody has suffered injuries and damages.

## DAMAGES FOR ALL CAUSES OF ACTION

108.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and for their damages for each cause of action further allege as follows:

109.    As a direct and proximate result of the failure of Defendant's Limb Salvage System with the Hinged Tibial Component, and the conduct, actions, inactions and omissions of Defendants, Plaintiff William B. Moody has sustained injuries and damages that have a value in excess of $75,000, exclusive of interest and taxable costs, including, but not limited to:

    A.  serious and permanent physical injuries to his body;

    B.  undergoing multiple surgeries to remove and replace the failed components and repair the damage that failure caused;

    C.  past and future pain, suffering, and anguish, both in mind and in body;

    D.  physical disability, past and future;

    E.  physical impairment, past and future;

    F.  disfigurement;

    G.  loss of enjoyment of life, past and future;

    H.  medical bills in excess of $75,000 associated with replacement surgery, therapy, and recovery there from, past and future; and,

I.   future surgery, medical bills and expenses.

110.   As a direct and proximate result of the defective Limb Salvage System with the Hinged Tibial Component, and the conduct, actions, inactions, and omissions of Defendants, Plaintiff Leslie S. Moody has suffered the loss of consortium of her husband, William B. Moody.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff William B. Moody and Plaintiff Leslie S. Moody each demand judgment in an amount in excess of $75,000, prejudgment interest, post-judgment interest, and taxable costs, along with any and all other relief available under the law to fully compensate them for their injuries and damages.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted this 1st day of April 2021.

s/ *George E. McLaughlin*
George E. McLaughlin
McLaughlin Law Firm, P.C.
1890 Gaylord Street
Denver, CO 80206-1211
720-420-9800
GEM@mcllf.com
*Attorney for Plaintiffs*
*William B. Moody and Leslie S. Moody*